1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11     EDGAR ALEJANDRO RADILLO,

12                    Petitioner,                   No. 2:13-cv-280-TLN-EFB P

13           vs.

14     DAVID B. LONG,                               FINDINGS AND RECOMMENDATIONS

15                    Respondent.

16

17           Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus

18     pursuant to 28 U.S.C. § 2254.  He challenges a judgment of conviction entered against him on

19     June 4, 2008 in the Yolo County Superior Court on charges of two counts of forcible rape, two

20     counts of rape in concert, and one count of assault, false imprisonment, and sexual battery.  He

21     seeks federal habeas relief on the following grounds:  (1) his constitutional rights were violated

22     by the prosecutor's improper use of peremptory challenges to exclude five Hispanics from the

23     jury; and (2) the denial of his motion for a separate trial and the admission into evidence at a joint

24     trial of his co-defendants' statements to police violated his federal constitutional rights.  Petitioner

25     also "joins all arguments raised by his codefendants which inure to his benefit."  ECF No. 1 at 5.

26     Upon careful consideration of the record and the applicable law and for the reasons set forth

27     below, it is recommended that petitioner's application for habeas corpus relief be denied.

28     /////

                                                   1

## I. Background

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Defendants, Alberto Sanchez (Alberto), Israel Sanchez (Israel) and Edgar Radillo (Edgar), picked up a young woman and drove her to a remote location in Yolo County where they sexually assaulted her. All three were convicted by a jury of two counts each of forcible rape (Pen.Code, § 261, subd. (a)(2)) and rape in concert (*id.* § 264.1) and one count each of assault ( *id.* § 245, subd. (a)(1)), false imprisonment (*id.* §§ 236 and 237, subd. (a)) and sexual battery (*id.* § 243.4, subd. (a)). (Further undesignated section references are to the Penal Code.) In addition, Alberto and Israel were convicted of kidnapping (§ 207, subd. (a)), while Edgar was found guilty of the lesser included offense of false imprisonment. Finally, the jury found as to Alberto and Israel that the rape and rape in concert offenses had been committed under circumstances involving a kidnapping and movement of the victim which substantially increased her risk of harm (§ 667.61).
>
> Alberto and Israel were sentenced to an aggregate determinate term of five years plus a consecutive indeterminate term of 25 years to life. Edgar received an aggregate determinate term of 23 years, 8 months.
>
> * * *
>
> The People correctly concede Alberto's two rape convictions (counts 2 and 4) and the false imprisonment convictions (count 7) of Israel and Alberto must be vacated. We thus accept those concessions. We also conclude Edgar's conviction for the lesser included offense of false imprisonment on count 1 must be dismissed in light of his conviction for the same offense on count 7. In all other respects, we affirm the judgments.
>
> **Facts and Proceedings**
>
> On the evening of August 11, 2006, 16–year–old Antonio S. met Edgar and Alberto at a school in Dixon and the three smoked marijuana. Later, Israel joined them and the four departed in Israel's 4–door Acura. They drove around Dixon for a while and then headed for Davis. Antonio and Edgar continued to smoke marijuana in the back seat of the car. At some point during their drive around Davis, they stopped for gas and Antonio purchased a bag of Doritos. They then continued their cruise past the local bars.
>
> That same evening, 23–year–old S.L. and some friends went out for a night of dinner and drinking in downtown Davis. At approximately 11:00 p.m., S.L. left her friends and went to another bar to meet someone. She left that bar at around 1:00 or 1:30 a.m.

2

She was intoxicated, tired and wanted to go home.  However, her ride for the evening had already gone home.

S.L. started walking down the street and thinking how she might get home.  Just then, Israel and the others drove by.  They stopped and asked if S.L. was alright and if she needed help.  S.L. said she wanted to go home and they offered to take her there.   S.L. accepted the offer and told them she lived off Covell and Alvarado in Davis.  She got in the back of the car between Antonio and Edgar and instructed them to take Highway 113 and exit at Covell.  She repeated that she just wanted to go home.  They agreed to take her home.

A couple of minutes after S.L. got into the car, the men began passing around a marijuana cigar to smoke.  They offered it to S.L. and she took a puff.  Israel proceeded onto Highway 113 but did not take the Covell exit.  As they drove, Antonio began touching S.L.'s leg and she told him to stop and pushed his hand away.   She repeated that she just wanted to go home.

As they drove away from Davis, S.L. asked where they were going, but nobody responded.  They eventually arrived at a remote area and drove up a dirt driveway.  Israel turned off the car and the car lights.

What happened thereafter is less certain.  Both S.L. and Antonio testified at trial and described different versions.  According to S.L., the four men got out of the car and ordered her out.  She refused, and one of them yelled at her to get out.  She got out of the car and began to cry.  S.L. pleaded, "Please don't do this.  Please don't.  I beg you, please stop.  Don't do this to me."  One of the men pushed S.L. onto the ground near the car and then someone got on top of her while the others stood around them in a circle.  The man on top of S.L. told her to take off her skirt.  She refused, and he took it off for her, along with her underpants.  S.L. then heard cheering and laughing and "abrela, abrela," which means open.  S.L. began moving around trying to get the man off of her and he punched her in the left eye.  He then penetrated her vagina with his penis.  The man remained on top of S.L. for five to seven minutes and then told her not to tell anyone.

According to S.L., after the first man got off her another took his place.  He too penetrated her vagina with his penis.  This man pulled down her shirt and bra and squeezed her left breast "very hard."   After this man got off S.L., the men kicked her in the stomach and neck.  She laid there until she heard the car engine start and heard them drive away.

Antonio testified pursuant to a plea deal whereby he was permitted to plead guilty to two felonies with no particular promise as to sentencing.  According to Antonio, after they arrived at the remote location, S.L. said she was going to be sick and she and Edgar got out of the car.  Israel and Alberto also got out, but Antonio remained in the car.  Edgar held S.L. while she vomited.  Israel eventually walked over to them and took over holding S.L.

3

Meanwhile, Alberto took S.L.'s purse out of the car and emptied it on the trunk. He found condoms inside.

According to Antonio, Alberto and Edgar eventually joined Israel and together they removed S.L.'s clothes. Israel and Alberto then walked S.L. over to a grassy area and laid her down. Alberto threw Israel a condom taken from S.L.'s purse. Israel got on top of S.L. and had sexual intercourse with her. According to Antonio, S.L. did not appear to be a willing participant. He heard her moaning and yelling "no" and "stop." After Israel finished, he asked, "Who is next?" Alberto gave Edgar another condom from S.L.'s purse and Edgar got on top of S.L. and had sexual intercourse with her.

At some point during the foregoing, Antonio got out of the car and smoked a cigarette. He also discarded the empty Doritos bag he had obtained at the gas station. By the time Edgar finished with S.L., Antonio was back in the car. After Edgar rejoined the others at the car, they got in and started to drive away. However, at the end of the driveway, Alberto told Israel to stop the car. Alberto got out and was gone four to five minutes. When he returned, he told them he had beaten S.L. up. On the way home, the others instructed Antonio not to say anything about what happened.

After the men left, S.L. blacked out for a short period. When she awoke, her stomach hurt and she was cold. She got up and started running from the area for fear that the men might return. In the distance, she saw the lights of a city and moved in that direction. She was wearing only her top and shoes. S.L. was eventually discovered by police officers at 4:45 a.m. walking along County Road 102. She appeared injured, stated that she had been raped and pointed in the direction of where it had occurred. She informed the officers that the rest of her clothes and her purse were still at the scene.

Officers eventually located the crime scene and found S.L.'s clothes and purse. They also found an empty Doritos bag, a condom wrapper, two condoms, and a receipt from one of the bars where S.L. had been that evening. They located an area where the grass appeared to be pressed down as if someone had been lying on it.

A fingerprint lifted from the Doritos bag was determined to be a match to one on file for Antonio. On August 25, officers served a search warrant at Antonio's home. They picked up Antonio and took him in for questioning. Antonio admitted picking up S.L. that evening and indicated three others had been involved. He identified one of the participants as Alberto Sanchez but provided only first names, Edgar and Israel, for the other two.

Officers later picked up Alberto, Edgar and Israel and brought them in for questioning. DNA from one of the condoms found at the scene was later determined to be a match for Edgar, and DNA from the other condom was found to be a match for Israel.

Alberto testified at trial. He admitted picking up S.L. in the early morning hours of August 12, 2006, and taking her to a remote

4

location.  According to Alberto, after they arrived at the scene, he walked over to a gate at the entrance to the driveway and remained there until they departed 15 minutes later.  He claimed not to have heard or seen anything that was done by the others with S.L.

As noted previously, Antonio was given a plea deal and testified for the prosecution.  The other three were charged with kidnapping (count 1), two counts of rape (counts 2 and 4), two counts of rape in concert (counts 3 and 5), assault (count 6), false imprisonment (count 7), and sexual battery (count 8).  They were also charged with enhancements on the rape and rape in concert charges for having kidnapped the victim and having moved her so as to substantially increase her risk of harm.

Israel and Alberto were convicted as charged.  Edgar was found guilty on all charges except kidnapping, for which he was instead convicted of the lesser included offense of false imprisonment.  The jury also found not true as to Edgar all of the enhancements on the rape and rape in concert charges.

Alberto was sentenced on the assault charge (count 6) to the upper term of four years and on the sexual battery charge (count 8) to a consecutive one-third the middle term of one year, for an aggregate determinate sentence of five years.  In addition, Alberto received a consecutive indeterminate term of 25 years to life for one rape in concert charge (count 3) and an identical term to run concurrently on the other rape in concert charge (count 5).  Sentence on the remaining counts was stayed pursuant to section 654.  Alberto received credit for time served of 356 days plus 53 days of conduct credits, for a total of 409 days.

Israel received the same sentence as Alberto, except instead of staying sentence on the rape charges (counts 2 and 4), the court struck those charges.  Israel received credit for time served of 346 days plus 51 days conduct credits, for a total of 397 days.

*People v. Sanchez*, No. C059763, 2011 WL 3806264, at \*\*1-4 (Cal.App. 3 Dist. Aug. 30, 2011).

After the California Court of Appeal affirmed petitioner's judgment of conviction, he filed a petition for review in the California Supreme Court.  Resp't's Lodg. Doc. 13.  Therein, petitioner raised all of the claims that he raises in the petition before this court.  *Id.*  The petition for review was summarily denied.  Resp't's Lodg. Doc. 14.

On February 4, 2013, petitioner filed a petition for writ of habeas corpus in this court.  ECF No. 1.

## II.  Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28

U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010);

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir.

2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

holdings of the United States Supreme Court at the time of the last reasoned state court decision.

*Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S.

___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v.

Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining

what law is clearly established and whether a state court applied that law unreasonably." *Stanley*,

633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

precedent may not be "used to refine or sharpen a general principle of Supreme Court

jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall*

*v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155

(2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so

widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

be accepted as correct. *Id.*  Further, where courts of appeals have diverged in their treatment of

an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

*Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[1] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,131 S. Ct. at 786-87.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

---

[1] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

2  considering de novo the constitutional issues raised.").

3  The court looks to the last reasoned state court decision as the basis for the state court

4  judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If

5  the last reasoned state court decision adopts or substantially incorporates the reasoning from a

6  previous state court decision, this court may consider both decisions to ascertain the reasoning of

7  the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When

8  a federal claim has been presented to a state court and the state court has denied relief, it may be

9  presumed that the state court adjudicated the claim on the merits in the absence of any indication

10  or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85. This

11  presumption may be overcome by a showing "there is reason to think some other explanation for

12  the state court's decision is more likely." Id. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

13  803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims

14  but does not expressly address a federal claim, a federal habeas court must presume, subject to

15  rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___,

16  ___, 133 S.Ct. 1088, 1091 (2013).

17  Where the state court reaches a decision on the merits but provides no reasoning to

18  support its conclusion, a federal habeas court independently reviews the record to determine

19  whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v.*

20  *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

21  review of the constitutional issue, but rather, the only method by which we can determine whether

22  a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no

23  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

24  reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

25  A summary denial is presumed to be a denial on the merits of the petitioner's claims.

26  *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze

27  just what the state court did when it issued a summary denial, the federal court must review the

28  state court record to determine whether there was any "reasonable basis for the state court to deny

relief." *Richter*, 131 S. Ct. at 784.  This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 786.  The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 131 S. Ct. at 784).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

**III. Petitioner's Claims**

### A. <u>Improper Use of Peremptory Challenges</u>

In petitioner's first ground for relief, he claims that his constitutional rights were violated by the prosecutor's improper use of peremptory challenges to exclude five Hispanics from the jury.  ECF No. 1 at 4.[2]  He argues that "the Prosecutor's expressed reasons for excusing several Minority jurors were sham, as is evident from a [comparative] Jury Analysis."  *Id.*

#### 1. <u>State Court Decision</u>

In a lengthy and thorough opinion, the California Court of Appeal described the background to this claim and its ruling thereon.  With citation to *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*), it accurately recited the governing law.  It noted that after the prosecution exercised its first five peremptory challenges on jurors who self-identified as Hispanic, each defendant raised a *Wheeler/Batson* challenge and that the prosecution responded with various nondiscriminatory reasons for the peremptory challenges, and the trial court rejected the challenge without prejudice to renewal at a later time.  The state appellate court observed that "[i]t is well settled that '[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias – that is, bias against

---

[2] Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds' ...

violates the defendant's right to equal protection under the Fourteenth Amendment to the United

States Constitution." *Sanchez*, 2011 WL 3806264, at *5.  In applying *Batson* to this record, the

state appellate court explained its reasoning as follows:

> A *Wheeler/Batson* challenge involves a three-step process. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race.  Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason.  Third, the court determines whether the defendant has proven purposeful discrimination.  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.]"  (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613.)

> Where, as here, the trial court makes no specific finding on whether the defendant made the required prima facie showing and the prosecutor explains the basis for her challenge, we proceed to the second and third steps of the process. (*People v. Cowan* (2010) 50 Cal.4th 401, 448.)

> "A prosecutor asked to explain his conduct must provide a '"clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.]  'The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation .]  A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons.  [Citations.]  Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection. [Citation.]  Certainly a challenge based on racial prejudice would not be supported by a legitimate reason." (*People v. Lenix, supra*, 44 Cal.4th at p. 613.)

> On direct review, the *Batson/Wheeler* issue "turns largely on an 'evaluation of credibility.'  [Citation.]  The trial court's determination is entitled to 'great deference,' [citation], and 'must be sustained unless it is clearly erroneous,' [citation]." (*Felkner v. Jackson* (2011) 562 U.S. —— .)

> "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.]  In assessing credibility, the court draws upon its contemporaneous observations of the voir dire.  It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.]"  (*People v. Lenix, supra*, 44 Cal.4th at p. 613, fn. omitted.)

"The proper focus of a *Batson/Wheeler* inquiry is on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, not on the objective reasonableness of those reasons. [Citation.]   What matters is that the prosecutor's reason for exercising the peremptory challenge is legitimate.  A '"legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection.  [Citations.]'  [Citation.]"  (*People v. Hamilton, supra*, 45 Cal.4th at p. 903.)

**Prospective Juror Danielle A.**

The prosecutor exercised her first peremptory challenge on Danielle A.  During the *Wheeler/Batson* hearing, the prosecutor explained she did not feel comfortable having Danielle on the jury because "she herself and her husband have been accused and arrested for drug offenses."  In her questionnaire, Danielle had answered "yes" to the question: "Have you, a close friend, or relative ever been ACCUSED or ARRESTED for a crime, even if the case did not come to court?"  Danielle further indicated the individuals involved had been herself, her husband and her son and that there had been no trial.  Danielle identified the crimes as "drug possession various traffic ect. [sic]."  In response to the question "What happened?" Danielle indicated: "probation, jail time, fines ect [sic]."  Finally, in response to the question, "How do you feel about what happened?" Danielle answered: "Things happened the way they should have[.] [Y]ou do something then you deserve the consequences of your actions."

During voir dire, the court questioned Danielle A. about the prior offenses as follows:

"Q. Now, you make reference in one of the questions to the situation involving yourself, your husband and your son.  Were any charges ever filed in that respect?

"A. Traffic, a few, but—

"Q. No felonies or misdemeanors?

"A. Yes, there were."

At the *Wheeler/Batson* hearing, the trial judge acknowledged that perhaps he should have been more assertive in questioning her about the prior offenses but he "didn't want to embarrass her."

Defendants contend the prosecution had insufficient information about the prior offenses to use them as a basis for excusing the potential juror.  They point out there was no information about the age of the offenses, where they occurred, whether there was a conviction, or whether they involved misdemeanors or felonies.  They argue it is uncertain whether Danielle A., her husband or her son had been the one involved in the drug offense.  Defendants further argue the prosecutor failed to question the juror about the offenses, thereby demonstrating this was not the motivating factor for her challenge.

11

1

2

3

The People acknowledge that the exact nature of the charges against Danielle A. and/or her husband and son is not revealed by the record but argue the prosecutor need not question a potential juror if the prosecutor already has enough information to make a decision on whether to allow the person to remain on the jury.

4

5

6

7

8

9

10

11

The People have the better argument. "A prospective juror's negative experience with the criminal justice system, including arrest, is a legitimate, race-neutral reason for excusing the juror." (*People v. Cowan, supra*, 50 Cal.4th at p. 450.) This is true whether it is the juror herself or a family member who was involved. (*See ibid.*) And while the age of the offense and whether it was a misdemeanor or a felony may be relevant considerations, they are not determinative. Hence, while a failure to engage in meaningful voir dire can in some important circumstances, be circumstantial evidence suggesting pretext (*People v. Lomax* (2010) 49 Cal.4th 530, 573), we agree with the People it was not necessary in this instance for the prosecution to ascertain the details of the prior offenses of Danielle A. or her family in order to use this as a legitimate basis for a peremptory challenge.

12

13

14

15

16

17

Defendants argue the pretextual nature of the prosecutor's stated rationale is revealed in her failure to challenge two similarly situated non-Hispanic jurors, Jurors No. 1 and 11. "'If a prosecutor's proffered reason for striking a [Hispanic] panelist applies just as well to an otherwise-similar [non-Hispanic] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered'" in the third step of the *Wheeler/Batson* analysis. (*People v. Lomax, supra*, 49 Cal.4th at pp. 571–572.) In this instance, Juror No. 1's father had been accused of sexual misconduct, and Juror No. 11 had received a speeding ticket "for no reason."

18

19

20

21

22

The People counter that Jurors No. 1 and 11 were not similarly situated to Danielle A., because elsewhere in their questionnaires they demonstrated a pro-prosecution or pro-victim bias. Juror No. 11 stated the following about the crimes charged in the instant case: "Rape is a very serious and terrible crime that should be punished fully." He also indicated a friend had previously been raped, but no charges had been filed and expressed a belief that rape is an underreported crime because of fear. Juror No. 1 disclosed that he had been a victim of sexual assault throughout his childhood, but no charges had ever been filed.

23

24

25

26

27

Again, we agree with the People. While Juror No. 1's father may have been accused of sexual misconduct, it also appears Juror No. 1 may have been the victim. Thus, he can hardly be considered one who believes his family may have been unjustly accused. And while Juror No. 11 did indicate he had been unjustly accused of speeding, he also demonstrated affinity to victims of the crimes charged in this matter. Thus, he too was not necessarily one who would have a bias against law enforcement.

28

The record supports a race-neutral basis for the prosecutor's challenge of Danielle A.

**Prospective Juror Carlos H.**

The prosecutor exercised her second peremptory challenge on potential Juror Carlos H.  The prosecutor based this challenge on the following factors: (1) as a teenager, Carlos had been kicked off of a ladder by a border patrol officer who was chasing illegal aliens; (2) Carlos had a bad experience with law enforcement in the resolution of a case where his grandson was the victim; (3) Carlos's uncle had been accused of and arrested for drug addiction; (4) Carlos believes some additional evidence is needed to support the testimony of a witness; and (5) Carlos's brother was accused of sexual assault.  Each of these factors is supported by Carlos's questionnaire responses.

Defendants argue the incident with the ladder, which occurred 42 years earlier, cannot serve as a valid basis for challenging the potential juror and the factor involving the grandson as a victim actually cuts against the defense, not the prosecution.  They further argue the prosecutor's failure to question Carlos H. about any of these factors reveals their pretextual nature.  Finally, defendants argue the prosecutor failed to challenge similarly situated jurors who had had negative experiences with law enforcement or expressed a belief that additional evidence is necessary to corroborate the testimony of a witness.

Given the many factors cited by the prosecutor, she cannot be faulted for failing to question the potential juror.  There was certainly enough from the questionnaire alone to support the challenge.  As for the age of the ladder incident, this merely goes to the weight of the factor.  And while the fact the potential juror's grandson was the victim of an unsolved robbery may have biased him against criminal defendants in general, the prosecutor was free to surmise this would also bias him against law enforcement who failed to solve the crime.  Finally, as to similarly-situated jurors, defendants point to none who have the same or similar combination of factors as Carlos H.  Thus, there were no similarly-situated jurors.

The record supports the prosecutor's peremptory challenge of Carlos H.

**Prospective Juror Sarah H.**

The prosecution's next challenge was to Sarah H. The prosecutor cited two factors supporting that challenge: (1) Sarah had had a negative experience with law enforcement; and (2) she had once been arrested for assault and had been required to convince the judge of her innocence.

In her questionnaire, Sarah H. answered "yes" to the question whether she ever had a particularly bad experience with law enforcement officials.  She explained: "A police officer, without his lights on, ran a red light in Davis and almost hit me while I was in the intersection.  He then tried to pull me over and give me a speeding ticket when I was not speeding.  He let me go after seeing

I was not alone in my vehicle and I demanded his badge number." Elsewhere in the questionnaire, Sarah indicated that, in 2004, she had been accused or arrested for assault by an ex-girlfriend and "had to prove [her] innocence and try to convince the judge that [the ex-girlfriend] had fabricated the story." As to how she felt about this experience, Sarah explained: "I feel that anyone can be accused of something they didn't do and are treated like a criminal even when the police report states otherwise."

Defendants contend the two grounds mentioned by the prosecutor, although supported by the questionnaire responses, were not in fact what motivated the challenge. They point to the fact the prosecutor failed to ask Sarah H. any questions about these two items and failed to challenge other jurors who had had negative experiences with law enforcement. In addition, defendants point out "the prosecutor completely ignored other significant grounds which were likely sufficient to support a challenge for cause . . . ." For example, Sarah indicated in her questionnaire that she "can never say someone is guilty unless [she has] personally witnessed them commit the crime." She expressed a belief "that law enforcement operates by racial profiling" and indicated she did not believe she could be "open minded to judging a stranger." According to defendants, the prosecutor's failure to mention these other potential grounds for challenge "is consistent with the conclusion that the strike was motivated by a discriminatory purpose rather than an assessment of the relevant characteristics of the prospective juror."

As discussed above, the fact the prosecutor did not also challenge Jurors No. 1 and 11, who had had negative experiences with law enforcement, does not render the prosecutor's use of this factor in challenging Sarah H. suspect. Those other jurors had other questionnaire responses that suggested a pro-prosecution or pro-victim bias. And as for the prosecutor's failure to question Sarah, such questioning is unnecessary if the questionnaire response provides sufficient information. Sarah was fairly clear in her questionnaire responses regarding the nature of the prior incidents.

As for the prosecutor's failure to mention other valid grounds for excusing Sarah H., we note that the hearing on defendants' *Wheeler/Batson* motion took place the morning after the prosecutor made the various peremptory challenges at issue here. When asked to comment on the basis for the challenges, the prosecutor began: "It might take me a minute because I took out this morning all of my Post–It notes in all the areas in justifying these particular areas." In other words, the prosecutor no longer had the notes she used the day before to assist her in deciding who to challenge. Therefore, it is not surprising that the prosecutor might not recall all of the grounds she used to warrant each of the challenges, and no particular inference should be drawn from this circumstance.

We conclude the record supports the prosecutor's peremptory challenge of Sarah H.

**Prospective Juror Maria C.**

The next potential juror to be challenged by the prosecution was Maria C. The prosecutor explained she was concerned with Maria's response to a question about aider and abettor liability. That question asked: "The law says that someone who aids or abets a crime is equally liable for having committed that offense. Is there anyone who has a problem with the concept of law that holds someone who aids, facilitates, promotes, encourages, or instigates a crime is equally liable for having committed that crime?" Maria answered "yes" and explained: "[T]hey can be lying and blaming someone else."

During voir dire, the prosecutor questioned Maria C. about this questionnaire response as follows:

"Ms. [C.], with regard to your questions on aiding and abetting, you indicated that you do have a problem with the concept that somebody who aids and abets a crime as being each legally liable for that crime. Is that a fair reading of your answer?

"A. I am not sure. I didn't understand that question really.

"Q. If the law were to tell you that helping or promoting or encouraging a crime that is committed, you are responsible for that crime that was committed, even if you are not the person who actually committed it. Do you have a problem with that?

"A. No.

"Q. And is that with regards to any type of crime or would you compartmentalize?

"In other words, do you know what I mean by that? Would you follow the law with regards to that?

"A. Yes.

"Q. And would you follow the law on everything?

"A. Yes."

Defendants contend the questionnaire response, when viewed in light of the voir dire answers, does not reflect confusion over the concept of aiding and abetting but confusion over the wording of the question itself and a concern that one defendant may be lying in order to get someone else in trouble. They further argue Maria C. provided other questionnaire responses that reflect a pro-prosecution bias, and the prosecutor failed to excuse another potential juror, Henry B., who likewise answered "yes" to the question whether anyone has a problem with aiding and abetting liability.

We agree the wording of the question could have been clearer. Read literally, the question asked whether "anyone" had a problem

with aiding and abetting liability.  It may reasonably be assumed there is someone in the world who has a problem with holding an aider and abettor equally liable for a crime.  But it does not appear Maria C. read the question literally.  She expressed a concern that one defendant may point the finger at another to get the other in trouble without any basis in fact.  This, of course, could be a potential concern for the prosecution, which intended to use the testimony of one of the perpetrators against the others.  Thus, Maria's response raised less of a concern about her willingness to hold aiders and abettors equally liable than a concern with her willingness to accept the testimony of a coconspirator.

As for other questionnaire responses that purportedly reveal a pro-prosecution bias, we do not share defendants' interpretation of those responses.  Maria C. answered "yes" to the question whether a police officer's testimony will be more truthful than that of a civilian witness.  She explained: "Sometimes the police either have seen what the civilian done [sic] or has a witness for proof."  Aside from the incoherence of this explanation, it does not appear to reveal a pro-police bias so much as a belief that police may be more truthful simply because they either saw what happened themselves or have a corroborating witness.  In other words, it is not that police officers are more truthful, it is just that they often have more first-hand knowledge.

In response to a question about whether the fact charges have been filed against the defendants causes her to conclude they are more likely guilty than not guilty, Maria C. answered "yes," but explained, "because depending on what that person has done."  This explanation makes no sense in the context and, therefore, provides little or no guidance on the issue.

Maria C. indicated the testimony of one witness would be enough for a conviction, but then followed up by answering "yes" to the question whether she would require additional evidence to corroborate the testimony of a witness.  Likewise, Maria expressed a belief that cases of sexual assault are over-reported but then explained that such cases are nevertheless important and that the law regarding sexual assault "could be a little too weak."  In our view, the foregoing responses do not reveal a pro-prosecution or anti-prosecution bias.

Finally, as to the prosecutor's failure to excuse Henry B., who also answered "yes" to the question about anyone having a problem with aider and abettor liability and explained that "[t]his will very [sic] from case to case," we note that defendants themselves excused Henry B. just before the prosecutor excused Maria C.  Hence, we have no way of knowing if the prosecutor would have challenged Henry B. as well.

We conclude the record supports the prosecutor's peremptory challenge to Maria C.

16

1       **Prospective Juror Monica V.**

2       The last potential juror to be excused by the prosecution before the
        *Wheeler/Batson* motion was Monica V.  The prosecutor identified
3       the following factors informing her decision: (1) Monica is young;
        (2) she has no children; (3) a police officer once battered her father;
4       and (4) she believes someone who accepts a ride from strangers is
        responsible for what happens to them.   According to the
5       questionnaire, Monica was 26 years old and had no children.  She
        explained the incident with her father as follows: "A police officer
6       battered my dad in Los Angeles . . . he sat my dad in hot the curb
        [sic] and my dad was wearing shorts my dad slide front [sic] to try
7       to move from the hot curb and the police hit my dad really bad."
        She answered "yes" to the question whether she believes one who
8       accepts a ride from a stranger is responsible for whatever happens
        to them, and explained: "Because you decided to accept the ride so
9       you are responsible if anything happens."

10      Defendants contend the factors cited by the prosecutor did not in
        fact motivate the peremptory challenge, inasmuch as the prosecutor
11      failed to challenge non-Hispanic jurors who were young and had no
        children, had had negative experiences with law enforcement, or
12      indicated that a person who accepts a ride from a stranger is
        responsible for what happens to them.  However, while it may be
13      true that the prosecutor failed to excuse certain jurors whose
        questionnaire responses revealed circumstances similar to Monica
14      V. as to age, lack of children, prior experiences with law
        enforcement, or responsibility of one who accepts a ride from a
15      stranger, defendants cite no juror who had the same combination of
        these factors.
16
        While comparative juror analysis is certainly relevant in assessing
17      the third step of the *Wheeler/Batson* analysis, "'we are mindful that
        comparative juror analysis on a cold appellate record has inherent
18      limitations.'  [Citation.]  In addition to the difficulty of assessing
        tone, expression and gesture from the written transcript of voir dire,
19      we attempt to keep in mind the fluid character of the jury selection
        process and the complexity of the balance involved.  'Two panelists
20      might give a similar answer on a given point.  Yet the risk posed by
        one panelist might be offset by other answers, behavior, attitudes or
21      experiences that make one juror, on balance, more or less desirable.
        These realities, and the complexity of human nature, make a
22      formulaic comparison of isolated responses an exceptionally poor

23      medium to overturn a trial court's factual finding.'   [Citation.]"
        (*People v. Taylor* (2009) 47 Cal.4th 850, 887.)
24
        We cannot say on the record before us that the trial court erred in
25      concluding the prosecutor utilized a valid, race-neutral rationale for
        excusing Monica V.  We therefore conclude the trial court did not
26      err in denying defendants' *Wheeler/Batson* motion.

27      *Sanchez*, 2011 WL 3806264, at **4-12.

28      /////

17

1    ## 2.  Legal Standards Regarding Petitioner's Batson Claim

2           Purposeful discrimination on the basis of race or gender in the exercise of peremptory

3    challenges violates the Equal Protection Clause of the United States Constitution.  *See Batson*,

4    476 U.S. at 79; *Johnson*, 545 U.S. at 62.  So-called *Batson* claims are evaluated pursuant to a

5    three-step test:

6                   First, the movant must make a prima facie showing that the
                    prosecution has engaged in the discriminatory use of a peremptory
7                   challenge by demonstrating that the circumstances raise "an
                    inference that the prosecutor used [the challenge] to exclude
8                   veniremen from the petit jury on account of their race."  [Citation
                    omitted.]  Second, if the trial court determines a prima facie case
9                   has been established, the burden shifts to the prosecution to
                    articulate a [gender]-neutral explanation for challenging the juror in
10                  question.  [Citation omitted.]  Third, if the prosecution provides
                    such an explanation, the trial court must then rule whether the
11                  movant has carried his or her burden of proving the existence of
                    purposeful discrimination.
12

13   *Tolbert v. Page*, 182 F.3d 677, 680 (9th Cir. 1999) (en banc).

14          In order to establish a prima facie case of racial discrimination, petitioner must show that

15   "(1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a

16   peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference

17   that the strike was motived by race."  *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006)

18   (citing *Batson*, 476 U.S. at 96 and *Cooperwood v. Cambra*, 245 F.3d 1042, 1045-46 (9th Cir.

19   2001)).  A prima facie case of discrimination "can be made out by offering a wide variety of

20   evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory

21   purpose.'"  *Johnson*, 545 U.S. at 169 (quoting *Batson*, 476 U.S. at 94.)  Both Hispanics and

22   African-Americans constitute cognizable groups for *Batson* purposes.  *Fernandez v. Roe*, 286

23   F.3d 1073, 1077 (9th Cir. 2002).

24          At the second step of the *Batson* analysis, "the issue is the facial validity of the

25   prosecutor's explanation."  *Hernandez v. New York*, 500 U.S. 352, 360 (1991).  "A neutral

26   explanation in the context of our analysis here means an explanation based on something other

27   than the race of the juror."  *Id.* at 360.  "Unless a discriminatory intent is inherent in the

28   prosecutor's explanation, the reason offered will be deemed race-neutral."  *Stubbs v. Gomez*, 189

18

1    F.3d 1099, 1105 (9th Cir. 1999) (quoting *Hernandez*, 500 U.S. at 360).  For purposes of step two,

2    the prosecutor's explanation need not be "persuasive, or even plausible."  *Purkett v. Elem*, 514

3    U.S. at 765, 768 (1995).  Indeed, "to accept a prosecutor's stated nonracial reasons, the court need

4    not agree with them."  *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006).

5            In the third step of a *Batson* challenge, the trial court has "the duty to determine whether

6    the defendant has established purposeful discrimination," *Batson*, 476 U.S. at 98, and, to that end,

7    must evaluate the "persuasiveness" of the prosecutor's proffered reasons.  *See Purkett*, 514 U.S.

8    at 768.  In determining whether petitioner has carried this burden, the Supreme Court has stated

9    that "a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of

10   intent as may be available.'"  *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Hous.*

11   *Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Hernandez*, 500 U.S. at 363.  "[A]ll of the

12   circumstances that bear upon the issue of racial animosity must be consulted."  *Snyder v.*

13   *Louisiana*, 552 U.S. 472, 478 (2008).  *See also Cook v. Lemarque*, 593 F.3d 810, 814 (9th Cir.

14   2010) (citation and internal quotation marks omitted) (stating the "totality of the relevant facts"

15   should be considered "to decide whether counsel's race-neutral explanation . . . should be

16   believed.").  In step three, the court "considers all the evidence to determine whether the actual

17   reason for the strike violated the defendant's equal protection rights."  *Yee v. Duncan*, 463 F.3d

18   893, 899 (9th Cir. 2006).

19           A prosecutor's reasons for striking a juror may be "founded on nothing more than a trial

20   lawyer's instincts about a prospective juror . . . so long as they are the actual reasons for the

21   prosecutor's actions."  *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (quoting *United*

22   *States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989)).  "Excluding jurors because of their

23   profession, or because they acquitted in a prior case, or because of a poor attitude in answer to

24   voir dire questions is wholly within the prosecutor's prerogative."  *United States v. Thompson*,

25   827 F.2d 1254, 1260 (9th Cir. 1987).  It is not improper for a prosecutor to rely on his instincts

26   with respect to the voir dire process.  *See Power*, 881 F.2d at 740 (quoting *Chinchilla*, 874 F.2d at

27   699).  In short, instinct and subjective factors have a legitimate role in the jury selection process.

28   /////

1    *Miller-El*, 545 U.S. at 252; *Burks*, 27 F.3d at 1429, n.3 ("peremptory strikes are a legitimate

2    means for counsel to act on . . . hunches and suspicions").

3         The defendant in the criminal prosecution bears the burden of persuasion to prove the

4    existence of unlawful discrimination. *Batson*, 476 U.S. at 93. "This burden of persuasion 'rests

5    with, and never shifts from, the opponent of the strike.'" *Johnson*, 545 U.S. at 2417 (quoting

6    *Purkett*, 514 U.S. at 768).

7         "Any constitutional error in jury selection is structural and is not subject to harmless error

8    review." *Williams v. Runnels*, 640 F.Supp.2d 1203, 1210 (C.D. Cal. 2010) (citing *Windham v.*

9    *Merkle*, 163 F.3d 1092, 1096 (9th Cir. 1998) and *Turner v. Marshall*, 121 F.3d 1248, 1254 n.3

10   (9th Cir. 1997). *See also Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (stating that among those

11   constitutional rights so basic "that their infraction can never be treated as harmless error" is a

12   defendant's "right to an impartial adjudicator, be it judge or jury") (citation and internal

13   quotations omitted); *Williams v. Woodford*, 396 F.3d 1059, 1072 (9th Cir. 2005) ("because a

14   *Batson* violation is structural error, actual harm is presumed to have resulted from the alleged

15   constitutional violation").

16              **3. <u>Analysis</u>**

17        This court need not address the preliminary issue of whether petitioner established a prima

18   facie case of purposeful discrimination because both the state trial and appellate courts ruled on

19   the ultimate question of intentional discrimination under the *Batson* analysis. *Hernandez*, 500

20   U.S. at 359; *United States v. Gillam*, 167 F.3d 1273, 1278 (9th Cir. 1999). The trial judge

21   apparently concluded that petitioner established a prima facie case of racial discrimination

22   because he asked the prosecutor to respond to defendants' *Batson* motion. Reporter's Transcript

23   on Appeal (RT) at 105. The sole issue before this court, therefore, is whether the California

24   courts unreasonably concluded that petitioner failed to meet his ultimate burden of establishing

25   that the prosecutor's challenges were motivated by racial discrimination under the third step of

26   the *Batson* analysis.

27        In evaluating habeas petitions premised on step three of a *Batson* violation, the standard of

28   review is "doubly deferential: unless the state appellate court was objectively unreasonable in

1   concluding that a trial court's credibility determination was supported by substantial evidence, we

2   must uphold it." *Jamerson v. Runnels,* 713 F.3d 1218, 1225 (9th Cir. 2013) (citations omitted).

3   This court can only grant petitioner's *Batson* claim "if it was unreasonable to credit the

4   prosecutor's race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333,

5   338 (2006).  In this case, when asked, the prosecutor expressed a neutral, reasonable basis for the

6   use of her peremptory challenges of all five of the Hispanic jurors.  RT at 105-07.  The

7   prosecutor's reasons were "clear and reasonably specific" and were "related to the particular case

8   to be tried." *Purkett*, 514 U.S. at 768-69.  They are also supported by the record.  The California

9   Court of Appeal analyzed each juror's answers to the juror questionnaire, the prosecutor's voir

10   dire of each stricken juror, and the characteristics of other similar jurors who were not stricken.

11   After a thorough comparison, the court concluded that the record supported a race-neutral basis

12   for each strike.  This court has also reviewed the record and agrees with the characterization of

13   the Court of Appeal with respect to the characteristics of the other jurors on the panel who were

14   not stricken by the prosecutor.

15        The fact that one or more of the prosecutor's proffered reasons for striking the Hispanic

16   jurors also applied to other jurors who were not stricken is "evidence tending to prove purposeful

17   discrimination to be considered at *Batson*'s third step." *Miller-El*, 545 U.S. at 241.  However, the

18   fact that an excused juror shares one or more characteristics with seated jurors does not end the

19   inquiry into discrimination in jury selection, nor does it establish that the prosecutor was acting

20   with discriminatory intent.  Rather, the court must evaluate the "totality of the relevant facts" to

21   decide whether "counsel's race-neutral explanation for a peremptory challenge should be

22   believed." *Ali v. Hickman*, 584 F.3d 1174, 1180 (9th Cir. 2009).  For the reasons stated by the

23   California Court of Appeal, the similarities between the stricken jurors and several of the seated

24   jurors do not undermine the prosecutor's stated reason for excusing the five Hispanic jurors.

25        This court also notes that petitioner's jury did contain one Hispanic juror.  Although not

26   decisive, "[t]he fact that African-American jurors remained on the panel 'may be considered

27   indicative of a nondiscriminatory motive.'" *Gonzalez v. Brown*, 585 F.3d 1202, 1210 (9th Cir.

28   2009) (quoting *Turner v. Marshall*, 121 F.3d 1248, 1254 (9th Cir. 1997)).  *See also Burks v.*

1   *Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994) (fact that jury contained an African-American member

2   is "a valid, though not necessarily dispositive, consideration in determining whether a prosecutor

3   violated *Batson*").

4            After reviewing the record, this court finds that the state court's disposition of petitioner's

5   *Batson* claim is not contrary to or an unreasonable application of clearly established federal law

6   nor did it result in a decision that is based on an unreasonable determination of the facts in light of

7   the evidence presented in the state court proceeding.  The record reflects that the state trial judge

8   performed an adequate evaluation of the prosecutor's reasons for challenging the Hispanic jurors

9   and appropriately denied petitioner's *Batson/Wheeler* motion.  After a review of the entire

10  relevant record, the court agrees with the state court that the prosecutor's stated reasons for her

11  exclusion of five Hispanic jurors were her genuine reasons for exercising a peremptory strike,

12  rather than a pretext invented to hide purposeful discrimination.  Petitioner has failed to carry his

13  burden of proving the existence of unlawful discrimination with respect to the prosecutor's

14  challenge to these jurors.  Accordingly, he is not entitled to relief on this claim.

15                        **B.  Violation of Right to Confrontation/Trial Severance**

16           In his next ground for relief, petitioner claims that the denial of his motion for a trial

17  severance and the admission at a joint trial of the redacted police statements of co-defendants

18  Israel Sanchez and Alberto Sanchez violated his right to a fair trial and to confront the witnesses

19  against him.  ECF No. 1 at 4.  He further argues the trial court's error in admitting these

20  statements was not cured by a limiting instruction given by the trial court.  ECF No. 22 at 10.[3]

21  /////

22

23           [3] That limiting instruction read as follows: "You have heard evidence that the defendants
    made statements out of court and before trial.  You may consider that evidence only against the
24  *declarant* and not against any other defendant," Clerk's Transcript on Appeal (CT) at 978.
    However, immediately preceding the introduction into evidence of the audiotapes containing
25  Israel and petitioner's police statements, the trial court misread the instruction and informed the
    jury that "these statements may be used as evidence only against the *defendant* and not against
26  other defendants."  RT at 1301, 1303.  Petitioner argues that "the court erroneously instructed the
    jury that the pretrial statements of a defendant could only be considered as evidence against a
27  defendant."  ECF No. 22 at 10.  This limiting instruction was correctly conveyed to the jury later
    during the giving of jury instructions.
28

                                                      22

1          **1.  State Court Decision**

2          Following the defendants' arrests, each was interviewed by the police and the interviews

3    were recorded.  The prosecution sought to introduce those recording at defendants' joint trial.

4    The California Court of Appeal observed that under the Sixth and Fourteenth Amendments to the

5    United States Constitution, a criminal defendant has a right "to be confronted with the witnesses

6    against him."  *Sanchez*, 2011 WL 3806264, at *12 (citing U.S. CONST., amend. VI, and *Pointer v.*

7    *Texas,* 380 U.S. 400 (1965)).  The court noted that the "central concern" of this right is "to ensure

8    the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in

9    the context of an adversary proceeding before the trier of fact."  *Id.* (citing *Maryland v. Craig*,

10   497 U.S. 836, 845 (1990)).  It also noted that the confrontation clause applies to hearsay

11   statements that are "'testimonial' in nature, including statements made during police

12   interrogation.'"  *Id.* (quoting *Crawford v. Washington*, 541 U.S. 36 (2004) (*Crawford*)).  It also

13   acknowledged that such hearsay may be admitted at trial only if the declarant is unavailable and

14   the defendant has had a previous opportunity to cross-examine the declarant.  *Id.*  The petitioner

15   argued that the trial court should have severed the trials because of the cross-incrimination of the

16   defendants' out-of-court statements and that the failure to do so violated petitioner's right of

17   confrontation under the Sixth Amendment.  The California Court of Appeal rejected that

18   argument, reasoning as follows:

19              In *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*), the California
                Supreme Court held that when the prosecution seeks to introduce an
20              extrajudicial statement of one defendant that implicates other
                defendants, the trial court has three options: (1) in a joint trial,
21              delete any direct or indirect identification of codefendants from the
                statement; (2) grant a severance; or (3) if severance is denied and
22              effective deletion is impossible, exclude the statement altogether.
                (*Id.* at pp. 530–531.)  In *Bruton v. United States* (1968) 391 U.S.
23              123 (*Bruton*), the United States Supreme Court held that
                introduction of an incriminating extrajudicial statement by a
24              codefendant violates the defendant's confrontation right, even
                where the jury is instructed to disregard the statement in
25              determining the defendant's guilt or innocence.

26              Edgar moved in limine to exclude the pretrial statements of his
                codefendants.  He argued any statements by the other defendants
27              implicating him would have to be redacted in a joint trial and,
                therefore, the court had three options: (1) separate trials, (2)
28              redaction, or (3) separate juries.  Edgar further argued "there is no

reasonable means by which the People can redact the statements" of the other defendants.  By inference, Edgar argued that if the court was inclined to admit the pretrial statements, it was required either to sever or to use separate juries.  Israel and Alberto joined in Edgar's motion.

The trial court refused to sever the defendants' trials and, apparently, did not consider using separate juries.  Thus, the court relied on redaction to protect defendants' constitutional rights.  The court instructed the jury that the pretrial statements of a given defendant could only be considered as evidence against that defendant.

Defendants present a multi-pronged attack on the trial court's decision to try them jointly and to permit introduction of redacted versions of their out-of-court statements.  They contend the court had essentially two choices, separate trials or exclusion of the statements altogether.  They argue the redacted versions of the custodial interviews did not adequately eliminate references to codefendants, as required by *Aranda/Bruton*.  Israel further argues the court erred in excluding from his custodial interview various exculpatory statements, which he was entitled to have admitted in evidence.  As we shall explain, we find no abuse of discretion in denying defendants' motion to sever or in admitting redacted versions of defendants' out-of-court statements.

"When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order [sic] separate trials." (§ 1098.)  Under this provision, the Legislature has stated a preference for joint trial of codefendants charged with the same offense.  At the same time, the trial court retains discretion to grant separate trials.  (*People v. Cummings* (1993) 4 Cal.4th 1233, 1286.)

"The court should separate the trial of codefendants 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'"  (*People v. Turner* (1984) 37 Cal.3d 302, 312, *overruled on other grounds* in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149–1150.)  "Whether denial of a motion to sever the trial of a defendant from that of a codefendant constitutes an abuse of discretion must be decided on the facts as they appear at the time of the hearing on the motion rather than on what subsequently develops."  (*People v. Isenor* (1971) 17 Cal.App.3d 324, 334.)

Defendants contend the trial court erred in failing to sever their trials.  However, the only ground asserted for separate trials was the cross-incrimination of defendants' out-of-court statements.  This is also the basis for defendants' separate contention that the trial court erred in admitting redacted versions of those statements.  Thus, the resolution of both issues turns on whether the redacted versions of defendants' out-of-court statements eliminated any cross-incrimination.

In *Bruton*, two defendants – Evans and Bruton – were tried jointly for robbery. Evans did not testify, but the prosecution introduced into evidence Evans's confession in which he stated he and Bruton committed the robbery. (*Bruton*, 391 U.S. at p. 124.) The trial judge instructed the jury it could consider the confession only as evidence against Evans. (*Id*. at p. 125.) The United States Supreme Court held that, despite the limiting instruction, the introduction of Evans's out-of-

court confession violated Bruton's Sixth Amendment right to cross-examine witnesses. (*Id*. at p. 137.)

In *Richardson v. Marsh* (1987) 481 U.S. 200 (*Richardson*), Marsh and Williams were jointly tried for murder and the prosecution introduced a redacted confession by Williams that omitted all references to Marsh and all indications that anyone other than Williams and a third person named Martin participated in the crime. (*Id*. at p. 202–203.) The trial court instructed the jury not to consider the confession against Marsh. (*Id*. at p. 205.) As redacted, the confession indicated Williams and Martin had discussed the murder in the front seat of a car while they traveled to the victim's home. (*Id*. at pp. 203–204.) However, later in the trial, Marsh testified that she was in the back seat of the car at the time. (*Id*. at p. 204.)

The Supreme Court held the redacted confession of Williams fell outside the scope of *Bruton* and was admissible (with an appropriate limiting instruction). The court distinguished the confession in *Bruton* as one that was "incriminating on its face," and had "expressly implicat[ed]" Bruton. (*Richardson*, 481 U.S. at p. 208.) By contrast, Williams's confession in *Richardson* amounted to "evidence requiring linkage" in that it "became" incriminating in respect to Marsh "only when linked with evidence introduced later at trial." (*Ibid*.) According to the court: "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Id*. at p. 211].)

In *Gray v. Maryland* (1998) 523 U.S. 185  (*Gray*), Gray and Bell were tried jointly for the murder of Stacey Williams. Bell did not testify at trial. However, the trial court permitted the prosecution to introduce a redacted version of Bell's confession. In the original, Bell indicated he, Gray and a third person, Vanlandingham, participated in the beating that led to Williams's death. The police detective who read the confession into evidence substituted the word "deleted" or "deletion" wherever the names of Gray and Vanlandingham appeared. Immediately after the redacted confession was read to the jury, the prosecutor asked, "after he gave you that information, you subsequently were able to arrest Mr. Kevin Gray; is that correct?" The officer responded, "That's correct." (*Id*. at pp. 188–189.) The prosecution produced other witnesses who said that six persons, including Bell, Gray, and Vanlandingham, participated in the beating. The trial judge

instructed the jury that the confession was evidence against Bell alone. (*Id.* at p. 189.)

The Supreme Court concluded the redaction was inadequate under the circumstances because, although the names of the other participants were eliminated, the redacted version continued to refer directly to the existence of the nonconfessing defendant. (*Gray, supra*, 523 U.S. at p. 192.) The court explained: "Redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result." (*Id.* at p. 192.) According to the court: "*Bruton*'s protected statements and statements redacted to leave a blank or some other similarly obvious alteration, function the same way grammatically. They are directly accusatory. Evans' statement in *Bruton* used a proper name to point explicitly to an accused defendant . . . . The blank space in an obviously redacted confession also points directly to the defendant, and it accuses the defendant in a manner similar to Evans' use of Bruton's name or to a testifying codefendant's accusatory finger. By way of contrast, the factual statement at issue in *Richardson* – a statement about what others said in the front seat of a car – differs from directly accusatory evidence in this respect, for it does not point directly to a defendant at all." (*Id.* at p. 194.)

In *Gray*, the Supreme Court noted that *Richardson* placed outside the scope of *Bruton* those statements that incriminate inferentially. (*Gray, supra*, 523 U.S. at p. 195.) However, the court cautioned that not all such statements fall outside *Bruton*. According to the court: "[I]nference pure and simple cannot make the critical difference, for if it did, then *Richardson* would also place outside *Bruton*'s scope confessions that use shortened first names, nicknames, descriptions as unique as the 'red-haired, bearded, one-eyed man-with-a-limp,' [citation], and perhaps even full names of defendants who are always known by a nickname. This Court has assumed, however, that nicknames and specific descriptions fall inside, not outside, *Bruton*'s protection. [Citation.] . . . [¶] That being so, *Richardson* must depend in significant part upon the kind of, not the simple fact of, inference. *Richardson's* inferences involved statements that did not refer directly to the defendant himself and which became incriminating 'only when linked with evidence introduced later at trial.' [Citation.] The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." (*Id.* at pp. 195–196.)

Defendants point to a number of statements in the redacted versions of their interview statements that, they argue, continue to implicate the others in the crimes. Thus, they contend, introduction of the redacted versions violated *Aranda/Bruton*. We shall consider the interview statements of each defendant in turn.

**Israel Sanchez**

In his interview with police, Israel initially denied ever being in Davis, but then acknowledged that he was in Davis around 11:00 p.m. in his car and saw a "drunk ass girl" come out of one of the bars. Israel told the officers the woman got in his car, asked for "weed" and then they went cruising. He initially denied having sex with her, claiming instead that he had masturbated while standing behind her. He initially denied using a condom but then said that he had. Later, Israel admitted lying on top of the girl and attempting to have sexual intercourse with her. However, he claimed not to have been able to penetrate her. Later, Israel admitted that he was able to penetrate her "a little bit." He denied striking the woman. Finally, Israel acknowledged that Antonio was in the car when this was occurring.

After explaining that the woman got in the car, asked for "weed," wanted to go home, but then wanted to cruise, Israel said: "So *we* cruised around in the fuckin cutties [FN1] and stuff. After that *we* post because I guess she wanted to throw up and stuff, she wasn't feeling well so *we* got out of the car and then she was about to throw up but she didn't. And she was just saying 'I don't feel well.'" (Italics added.)

FN1. The term "cutties" in this context "Refers to an area far away in distance or in the middle of nowhere." (Urban Dict. (1999–2011) <http:// www.urbandictionary.com/define.php?term=Cutties> [as of Aug. 30, 2011].)

Defendants argue the foregoing statement implicated them because, by the time the jury heard it, evidence had already been presented that both Edgar and Alberto were also in the car with Israel, Antonio and S.L. and, therefore, they fell within the reference to "we."

It is readily clear Israel's statement that "we" cruised around and "we" got out of the car did not implicate Edgar or Alberto on its face, especially when Israel had previously indicated that both Antonio and the victim were with him in the car and he did not mention anyone else. The fact that the statement may implicate the others, when considered in conjunction with other evidence placing Edgar and Alberto in the car, does not bring the statement within the scope of *Aranda/Bruton*. (*Richardson, supra*, 481 U.S. at p. 208.)

Defendants contend the foregoing evidence is "remarkably similar" to that in *People v. Song* (2004) 124 Cal.App.4th 973, where this court found a violation of *Aranda/Bruton*. Defendants are mistaken. In *Song*, a detective testified that one defendant told him he saw a codefendant force the victim into the car. (*Song*, at p. 979.) The People conceded error but argued it was not prejudicial. (*Id.* at p. 981.)

*Song* is clearly distinguishable from the present matter. In *Song*, the codefendant's statement implicated the defendant directly by

name, whereas in the present matter Israel's statement did not mention the codefendants by name or suggest the presence of any unidentified perpetrators at the time of the offenses.   Only by reference to other evidence could the "we" mentioned by Israel be considered to include Edgar and Alberto.

Defendants also take issue with a statement made by Israel about smoking marijuana.  When asked how much marijuana he smoked that evening, Israel answered: "Um I think *we* had like two blunts yeah *we* only had like two blunts rolled up."  (Italics added.)  He was then asked if he handed a blunt to S.L., and Israel answered: "No *we* were just rotating."  (Italics added.)

Again, there is no direct reference to either Edgar or Alberto or any unidentified persons being present, and the "we" can easily be interpreted as referring to Israel, Antonio and S.L.  Edgar and Alberto are implicated only by virtue of other evidence placing them in the car at the time.  Under *Richardson*, this falls outside of *Aranda/Bruton*.

Finally, defendants take issue with a number of statements made by Israel that amounted to admissions by him that he committed the various charged crimes.   For example, defendants cite Israel's admission that, while lying on top of S.L., he attempted to penetrate her for six to seven minutes.  They further cite Israel's statement that S.L. told him to stop and she was too drunk to fight back. Defendants argue that, by implicating himself in a forcible rape, as alleged in count 2, Israel also implicated them as aiders and abettors in that crime as well as rape in concert, as alleged in count 3. Defendants further argue these statements negated their own assertions at trial that S.L. had gone with them voluntarily and had engaged in consensual sex.

Defendants seek to stretch *Aranda/Bruton* far beyond its legal bounds.  The evil those cases seek to avoid is the admission of statements by one defendant that identify another defendant, either directly or indirectly, as having been involved in the crime without that other defendant having an opportunity to test those statements through cross-examination.  *Aranda/Bruton* does not seek to keep out all statements by one defendant that might somehow prove to be harmful to another defendant once that other defendant's participation in the crimes is established through other evidence.  In this instance, Israel's statements implicating himself alone would have an adverse impact on the other defendants as aiders and abettors only if Israel also identified those others as having participated.  However, such participation was established through other evidence.    Under *Richardson*, introduction of Israel's statements did not violate the confrontation rights of these other defendants.

*   *   *

/////

/////

28

**Edgar Radillo**

Edgar first denied having been in Davis at any time during the past year, but then admitted recently picking up a girl in Davis. According to Edgar, when they arrived at the crime scene, "She gets out of the car screaming" and "started tripping out saying she was going to call the cops." Edgar claimed that, after they arrived at the scene, he stayed in the car with Antonio and denied touching S.L. However, Edgar later admitted putting a condom on and intending to have sexual intercourse with her. But, according to Edgar, he changed his mind and took the condom off. He denied ever getting on top of S.L. but then admitted doing so and rubbing his penis on her. He at first denied penetrating S.L. but then acknowledged having done so once. Edgar denied getting into S.L.'s purse but then admitted taking the condom from the purse. He identified Antonio as being present and asserted that Antonio remained in the car the whole time.

After acknowledging that he picked a girl up off the street in Davis, Edgar indicated he talked to her and she said "she was going to the university or something." The following colloquy ensued:

"DETECTIVE HERNAN OVIEDO: Okay. What else did you guys talk about in the car?

"EDGAR RADILLO: Nothing she just talked about uh well what we were going to do with our life that she had something but I don't know stuff. She was telling me about her life. That she don't like white guys and I don't know she was telling me.

"DETECTIVE HERNAN OVIEDO: Were you guys drinking in the car?

"EDGAR RADILLO: No she was already drunk. We didn't drink at all."

Defendants contend that, by the time Edgar's interview tape was played, the jury was already aware Alberto and Israel were in the car with Edgar, Antonio and S.L. Thus, the foregoing implicated them in the offenses despite the use of the neutral pronoun "we." However, as explained earlier, the fact that evidence outside of an out-of-court statement can be used to link unnamed defendants to the statement does not implicate *Aranda/Bruton*. In the context where Edgar had just explained that he and S.L. were talking to each other in the car, the officer's questions about "you guys" and Edgar's statement that "we" didn't drink could reasonably be viewed as referring to Edgar and S.L. alone. Only when coupled with other evidence outside the interview, are Israel and Alberto arguably implicated.

The same goes for Edgar's statement shortly thereafter about how S.L. jumped out of the car and was "tripping out:    "We were already out in the cuts [[[FN2 we didn't know where we going. I don't even know the cuts. I was lost. And then we just ended up somewhere. And then she started tripping out saying she was going

to call the cops and I don't know."  The "we" there could easily have referred to Edgar, Antonio, and S.L., whom Edgar acknowledged were present.  Only by reference to evidence outside Edgar's interview are Israel and Alberto implicated.

FN2. In this context "cuts" means, "A term to describe a remote area that is either hidden, distant, or both."  (Urban Dict. (1999–2011) <http:// www.urbandictionary.com/define.php?term=cuts & page=2> [as of Aug. 30, 2011].

Likewise, Edgar's statement that "[n]obody" helped S.L. out of the car and over to where she was sexually assaulted did not refer to either Israel or Alberto and did not suggest anyone else was present besides Edgar and Antonio.

The remaining statements defendants cite as violating *Aranda/Bruton* all implicated Edgar alone in the crimes.  As with Israel's statements of a similar nature, defendants argue that by implicating himself in a rape, Edgar likewise adversely impacted their consent defenses.  However, as with Israel's statements, Edgar's self-implication is only adverse to Israel and Alberto if other evidence outside Edgar's interview placed them at the scene.  Under these circumstances, there is no *Aranda/Bruton* error.  (*Richardson, supra*, 481 U.S. at p. 208.)

**Alberto Sanchez**

Apparently, the prosecution concluded it could not redact Alberto's pretrial interview sufficiently to present it at trial.  Instead, Alberto's pretrial statements were presented through the testimony of the questioning officer.  Alberto admitted picking up S .L. but denied touching her.  Then he admitted shaking hands with her and touching her clothing.  Alberto claimed S.L. got into the car willingly and asked for marijuana.  He also admitted touching a condom and a pair of panties.

Defendants contend two of Alberto's statements came in that referred to "they" as having done something, as in "they" went to the "cutties" and, as Alberto was holding S.L. up while she threw up, "they" came over.  The remaining statements to which defendants object all implicated Alberto alone in the offenses, and the others by implication as aiders and abettors.  However, as discussed above, none of these statements violated *Aranda/Bruton*.  The use of "they" implicates the others only when coupled with evidence outside of Alberto's statements, and the self-incriminating statements do not fall within *Aranda/Bruton* even if they might ultimately harm the others.

Furthermore, Alberto eventually testified at trial and was therefore available for cross-examination by the other defendants.  Defendants contend this does not matter, because at the time the officer testified about what Alberto said, Alberto had not yet testified and therefore was unavailable as a witness and could not be cross-examined on his out-of-court statements.  But we fail to see what the timing of defendants' opportunity to cross-examination

30

1
2
3

Alberto about his out-of-court statements has to do with it.  The ability to cross-examination is the ability to cross-examine, whenever it occurs.  *Aranda/Bruton* is not implicated if the declarant is available at trial.

4
5
6
7
8
9
10

Defendants claim introduction of the pretrial interview statements of each of them violated *Crawford*, even if those statements did not implicate them directly.  In *Crawford*, the United States Supreme Court "repudiated [its] prior ruling in *Ohio v. Roberts* (1980) 448 U.S. 56, under which an unavailable witness's statements were admissible against a criminal defendant if the statement bore 'adequate "indicia of reliability."' [Citation.] . . . *Crawford* held that out-of-court statements by a witness that are testimonial are barred under the Sixth Amendment's confrontation clause unless the witness is shown to be unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the trial court." (*People v. Monterroso* (2004) 34 Cal.4th 743, 763.)

11
12
13
14
15
16

There is no question the interview statements of defendants were testimonial within the meaning of *Crawford* and, at least as to Edgar and Israel, the declarants were unavailable as witnesses.  However, "*Crawford* addressed the introduction of testimonial hearsay statements against a defendant." (*People v. Stevens* (2007) 41 Cal.4th 182, 199, italics added.)  As explained above, none of defendants' interview statements admitted at trial contained evidence against any of the others.  Thus, they did not implicate the confrontation clause.  (*Ibid.*) "The same redaction that 'prevents *Bruton* error also serves to prevent *Crawford* error.'"  (*Ibid.*; accord, *People v. Song, supra*, 124 Cal.App.4th at p. 984.)

17  *Sanchez*, 2011 WL 3806264, at **12-19.

18  ### 2. **Applicable Legal Standards**

19  #### a. **Severance**

20      A court may grant habeas relief based on a state court's decision to deny a motion for

21  severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial.

22  *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993) (court must decide if "there is a serious risk

23  that a joint trial would compromise a specific trial right of one of the defendants, or prevent the

24  jury from making a reliable judgment about guilt or innocence"); *United States v. Lane*, 474 U.S.

25  438, 446 n.8 (1986) ("misjoinder would rise to the level of a constitutional violation only if it

26  results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial");

27  *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991) (same); *see also Comer v. Schiro*,

28  480 F.3d 960, 985 (9th Cir. 2007) (in the context of the joinder of counts at trial, habeas relief

31

1   will not be granted unless the joinder actually rendered petitioner's state trial fundamentally

2   unfair and therefore violative of due process).  Petitioner bears the burden of proving that the

3   denial of severance rendered his trial fundamentally unfair,  *Grisby v. Blodgett*, 130 F.3d 365, 370

4   (9th Cir. 1997), and must establish that prejudice arising from the failure to grant a severance was

5   so "clear, manifest, and undue" that he was denied a fair trial.  *Lambright v. Stewart*, 191 F.3d

6   1181, 1185 (9th Cir. 1999) (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1071-72 (9th

7   Cir. 1996)).  On habeas review, federal courts neither depend on the state law governing

8   severance, *Grisby*, 130 F.3d at 370 (citing *Hollins v. Dep't of Corrections, State of Iowa*, 969 F.2d

9   606, 608 (8th Cir. 1992)), nor consider procedural rights to a severance afforded to criminal

10   defendants in the federal criminal justice system.  *Id.*  Rather, the relevant question is whether the

11   state proceedings satisfied due process.  *Id.*; *see also Cooper v. McGrath*, 314 F. Supp. 2d 967,

12   983 (N.D. Cal. 2004).

### b. Right to Confrontation

14   The Sixth Amendment to the United States Constitution grants a criminal defendant the

15   right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The 'main and

16   essential purpose of confrontation is to secure for the opponent the opportunity of cross-

17   examination.'"  *Fenenbock v. Director of Corrections for California*, 692 F.3d 910, 919 (9th Cir.

18   2012) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)).  The Confrontation Clause

19   applies to the states through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 406

20   (1965).

21   In 2004, the United States Supreme Court held that the Confrontation Clause bars the state

22   from introducing into evidence out-of-court statements which are "testimonial" in nature unless

23   the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness,

24   regardless of whether such statements are deemed reliable.  *Crawford v. Washington*, 541 U.S. 36

25   (2004).  The *Crawford* rule applies only to hearsay statements that are "testimonial" and does not

26   bar the admission of non-testimonial hearsay statements.  *Id.* at 42, 51, 68.  *See also Whorton v.*

27   *Bockting*, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application to" an "out-of-

28   court nontestimonial statement.")  Although the *Crawford* court declined to provide a

1   comprehensive definition of the term "testimonial," it stated that "[s]tatements taken by police

2   officers in the course of interrogations are . . . testimonial under even a narrow standard."

3   *Crawford*, 541 U.S. at 52.

4          In *Bruton v. United States*, 391 U.S. 123 (1968), the United States Supreme Court held

5   that a defendant is deprived of his Sixth Amendment right of confrontation when a facially

6   incriminating confession of a non-testifying co-defendant is introduced at their joint trial, even if

7   the jury is instructed to consider the confession only against the co-defendant.  391 U.S. at 135.

8   "Under *Bruton* and its progeny 'the admission of a statement made by a non-testifying

9   codefendant violates the Confrontation Clause when that statement facially, expressly, or

10  powerfully implicates the defendant.'"  *United States v. Hernandez-Orellana*, 539 F.3d 994, 1001

11  (9th Cir. 2008) (quoting *United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir. 2007)).  *Bruton*

12  presented a "context[ ] in which the risk that the jury will not, or cannot, follow instructions is so

13  great, and the consequences of failure so vital to the defendant, that the practical and human

14  limitations of the jury system cannot be ignored."  *Id.* at 135.

15         *Gray v. Maryland*, 523 U.S. 185 (1998) extended *Bruton* to a codefendant's confession,

16  under similar joint-trial circumstances, that was "redacted . . . by substituting for the defendant's

17  name in the confession a blank space or the word 'deleted.'"  *Gray*, 523 U.S. at 188.  The Court

18  held that these redactions made no constitutional difference.  *Id.*  However, in *Richardson v.*

19  *Marsh*, 481 U.S. 200 (1987), the Supreme Court held that the admission of a nontestifying

20  codefendant's confession did not violate the defendant's rights under the Confrontation Clause

21  where the trial court instructed the jury not to use the confession in any way against the

22  defendant, and the confession was redacted to eliminate not only the defendant's name, but any

23  reference to her existence.  In *People v. Aranda*, 63 Cal. 2d 518 (1965), the California Supreme

24  Court held that at a joint trial, a co-defendant's extrajudicial statements inculpating another

25  defendant must be excluded, even if the co-defendant testified at trial.  *Aranda* was abrogated in

26  part in 1982 by an amendment to the California Constitution.  *See People v. Boyd*, 222 Cal. App.

27  3d 541, 562 (1990) ("Thus, to the extent *Aranda* required exclusion of inculpatory extrajudicial

28  statements of co-defendants, even when the co-defendant testified and was available for cross-

1    examination at trial, *Aranda* was abrogated by Proposition 8."). The *Crawford* decision "did not

2    overrule *Bruton* and its progeny." *United States v. Williams*, 429 F.3d 767, 773 (8th Cir. 2005).

3    *See also Crawford*, 541 U.S. at 57-58.

4         Confrontation Clause violations are subject to harmless error analysis. *Whelchel v.*

5    *Washington*, 232 F.3d 1197, 1205-06 (9th Cir. 2000). "In the context of habeas petitions, the

6    standard of review is whether a given error 'had substantial and injurious effect or influence in

7    determining the jury's verdict.'" *Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir. 1994) (quoting

8    *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Factors to be considered when assessing the

9    harmlessness of a Confrontation Clause violation include the importance of the testimony,

10   whether the testimony was cumulative, the presence or absence of evidence corroborating or

11   contradicting the testimony, the extent of cross-examination permitted, and the overall strength of

12   the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).[4]

13        **3. Analysis**

14        Petitioner claims that the trial court violated his rights under the Confrontation Clause by

15   admitting into evidence the police statements of Israel and Alberto Sanchez, wherein they

16   referred to the people in the car as "we" and made other statements that provided crucial evidence

17   to support the kidnapping, rape and sexual battery charges. As set forth above, the California

18   Court of Appeal, in a thorough analysis, concluded that the admission of Israel and Alberto's

19   statements did not violate the Confrontation Clause because they implicated petitioner only when

20   coupled with other evidence outside of those statements. The state court concluded that the word

21   "we" could have been interpreted by the jury to refer to petitioner, S.L., and Antonio, who the

22   jurors were already aware were in the car, and that the other incriminating statements only

23   implicated petitioner in the crimes because his participation had been established by other

24   evidence. These conclusions by the Court of Appeal are based a reasonable interpretation of the

25   /////

26

27        [4] Although *Van Arsdall* involved a direct appeal and not a habeas action, "there is nothing
     in the opinion or logic of *Van Arsdall* that limits the use of these factors to direct review."
28   *Whelchel*, 232 F.3d at 1206.

1   facts of this case and are not contrary to or an unreasonable application of the holdings in *Bruton*,

2   *Richardson*, and *Gray*.

3           Further, unlike the situation in *Gray*, the statements of Edgar Radillo and Israel Sanchez

4   were not altered by the trial court to insert a pronoun for petitioner's name.  Rather, their

5   statements were introduced as they spoke them, with any reference to petitioner being supplied by

6   other evidence outside of those statements.  In addition, petitioner's jury received a limiting

7   instruction that informed the jurors the admitted statements could only be considered against the

8   declarant and not against any other defendant.  Although the trial judge originally misspoke when

9   delivering this instruction, substituting the word "defendant" for the word "declarant," the error

10  was corrected during the formal recitation of jury instructions.

11          Further, as noted by the California Court of Appeal, Alberto Sanchez testified at trial and

12  was subject to cross-examination.  Because petitioner was given the opportunity to cross-examine

13  Alberto about his statements to police, the admission of those statements did not violate

14  petitioner's rights under the Confrontation Clause.  *Crawford,* 541 U.S. at 59 n.9 (2004) ("when

15  the declarant appears for cross-examination at trial, the Confrontation Clause places no

16  constraints at all on the use of his prior testimonial statements"); *California v. Green*, 399 U.S.

17  149, 162 (1970) ("where the declarant is not absent, but is present to testify and to submit to

18  cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-

19  court statements does not create a confrontation problem"); *Delaware v. Fensterer*, 474 U.S. 15,

20  21-22 (1985) ("the Confrontation Clause is generally satisfied when the defense is given a full

21  and fair opportunity to probe and expose . . . infirmities through cross-examination, thereby

22  calling to the attention of the factfinder the reasons for giving scant weight to the witness'

23  testimony"); *United States v. Valdez-Soto*, 31 F.3d 1467, 1470 (9th Cir. 1994) ("We are aware of

24  no Supreme Court case, or any other case, which holds that introduction of hearsay evidence can

25  violate the Confrontation Clause where the putative declarant is in court, and the defendants are

26  able to cross-examine him").  Because there is no violation of the right to confrontation when the

27  declarant is available for cross-examination, petitioner is not entitled to relief on his claims

28  directed to Alberto Sanchez's police statements.

1    The decision of the California Court of Appeal that the admission of Alberto and Israel

2    Sanchez's statements did not violate petitioner's rights under the Confrontation Clause is not

3    contrary to or based on an unreasonable determination of clearly established federal law.

4    Accordingly, petitioner is not entitled to habeas relief on this claim.[5]

5    Because there was no Confrontation Clause error at petitioner's trial, the trial court did not

6    violate petitioner's federal constitutional rights in denying petitioner's motion to sever his trial

7    from that of his co-defendants.  The joint trial was not "so prejudicial that it denied a petitioner

8    his right to a fair trial." *Zafiro*, 506 U.S. at 538-39.  Accordingly, petitioner is not entitled to

9    federal habeas relief on his severance claim.

10    **C.  Joinder in Claims of Co-Defendants**

11    In his last ground for relief, petitioner states that he "joins all arguments raised by his

12    codefendants which inure to his benefit."  ECF No. 1 at 5.

13    Petitioner's co-defendants Israel Sanchez and Alberto Sanchez also filed habeas petitions

14    challenging their state court convictions in this court.  *See Sanchez v. Paramo*, Case No. 2:13-cv-

15    0491-TLN-EFB P, and *Sanchez v. Spearman*, Case No. 2:12-cv-2869-TLN-EFB P.  Petitioner's

16    case and that of Israel Sanchez and Alberto Sanchez are related under Local Rule 123(a).

17    However, compliance with Local Rule 123(a) merely results in assignment of all three cases to

18    the same judge.  There has been no consolidation of these three actions.

19    /////

20

_____

21    [5]  Because the trial court did not commit error under *Bruton* in admitting the statements of
Edgar Radillo, there is no *Crawford* error.  *See, e.g., United States v. Rakow*, 286 F. App'x 452,

22    454 (9th Cir. 2008) (court denies *Crawford* violation where prior testimony of co-defendant was
admitted against co-defendant, because ". . . absent *Bruton* error, *Crawford* has no work to do in

23    this context . . . .") (citing *United States v. Johnson*, 297 F.3d 854, 856 n. 4 (9th Cir. 2002);
*United States v. Chen*, 393 F.3d 139, 150 (2d Cir. 2004) (the same factual circumstances

24    surrounding admission of co-defendant's statement "that prevent *Bruton* error also serves to
prevent *Crawford* error."); *United States v. Gould*, No. CR 03–2274 JB, 2007 WL 1302593, at *3

25    (D.N.M. Mar. 23, 2007) ("If a limiting instruction is given to the jury, a properly redacted
statement of a co-defendant, one that satisfies *Bruton* . . . , does not raise a Confrontation Clause

26    issue pursuant to *Crawford* ..., because such a statement is not offered against the defendant.");
*Bolus v. Portuondo*, No. 9:01–CV–1189, 2007 WL 2846912, at *21 (N.D.N.Y. Sept. 26, 2007)

27    ("Since this court finds no *Bruton* error, there would be no *Crawford* error, even if *Crawford*
were applicable.").

28

1   Petitioner may not incorporate by reference any claims raised by his co-defendants.  The

2   Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254

3   ("Habeas Rules"), require that each habeas petition specify all the grounds for relief, state the

4   facts supporting each ground, and state the relief requested.  *See* Habeas Rule 2(c).  Further, the

5   form for filing a petition for writ of habeas corpus in this court advises that all claims raised

6   therein must allege facts in support of each claim.  Petitioner's vague and unsupported statements

7   fail to demonstrate entitlement to federal habeas relief.  *See Jones v. Gomez*, 66 F.3d 199, 204

8   (9th Cir. 1995) (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("It is well-settled that

9   '[c]onclusory allegations which are not supported by a statement of specific facts do not warrant

10  habeas relief'")).  The court notes that petitioner's attempt to join in the federal habeas claims

11  raised by Israel and Alberto Sanchez is based on California Rules of Court, rule 8.200(a) (5),

12  which allows a co-appellant to "join in or adopt by reference all or part of a brief in the same or a

13  related appeal."  The California Rules of Court are inapplicable to federal habeas petitions.

14  In any event, in connection with their respective federal habeas actions, this court has

15  concluded that none of the claims raised by Israel and Alberto Sanchez have merit.  Accordingly,

16  petitioner has failed to demonstrate entitlement to federal habeas relief based on the claims of his

17  co-defendants.

18  **IV. Conclusion**

19  Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED that

20  petitioner's application for a writ of habeas corpus be denied.

21  These findings and recommendations are submitted to the United States District Judge

22  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

23  after being served with these findings and recommendations, any party may file written

24  objections with the court and serve a copy on all parties.  Such a document should be captioned

25  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

26  shall be served and filed within fourteen days after service of the objections.  Failure to file

27  objections within the specified time may waive the right to appeal the District Court's order.

28  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

1   1991).  In his objections petitioner may address whether a certificate of appealability should issue

2   in the event he files an appeal of the judgment in this case.  *See* Rule 11, *Rules Governing Section*

3   *2254 Cases* (the district court must issue or deny a certificate of appealability when it enters a

4   final order adverse to the applicant).

5   DATED:  May 21, 2015.

6                                     EDMUND F. BRENNAN
7                                     UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28